IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA MCKINNEY,                    }
                                    }
        Plaintiff,                  }
                                    }      CIVIL ACTION NO.
v.                                  }      06-AR-0696-S
                                    }
R&L FOODS, LLC, d/b/a WENDY'S       }
OLD FASHIONED HAMBURGERS,           }
                                    }
        Defendant.                  }

**MEMORANDUM OPINION**

Before the court is the motion of defendant, R&L Foods, LLC, d/b/a Wendy's Old-Fashioned Hamburgers ("R&L"), for summary judgment in the above-entitled action brought by plaintiff, Angela McKinney, who claims sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the state-law torts of invasion of privacy, assault and battery, negligent supervision, and negligent retention.  For the reasons that follow, R&L's motion will be granted in part and denied in part.

*Pertinent Undisputed Facts*[1]

R&L is a company which, until July 2005, owned and operated a Wendy's Old-Fashioned Hamburgers ("Wendy's") restaurant in the Century Plaza located in Birmingham, Alabama.  Affidavit of Gary Real (herein, "Real Aff.") (Doc. No. 36-2), at ¶ 1.  McKinney

---

[1] The parties dispute some of the facts.  However, for purposes of this memorandum opinion, the court will recite disputed facts in the light most favorable to McKinney, giving her the benefit of every doubt.

worked as a crew person at the Century Plaza store from the summer of 1999 until she resigned for personal reasons less than one year later.  Deposition of McKinney (herein, "McKinney Dep.") (Docs. Nos. 36-4 — 36-13), at 37:5 — 38:18.  She was rehired as a crew person at the Century Plaza Wendy's in 2001.  *Id.*, at 58:17 — 59:10.  She was promoted by then store manager, Deltrika Mackey, to the position of shift leader later in 2001.  *Id.*, at 32:3-22.[2]  As shift leader, McKinney was responsible for opening and closing the store, completing necessary paperwork, and generally overseeing the shift, but she was not considered to be a part of management.  *Id.*, at 35:17 — 36:17.  In February 2002, Jerry Young took over for Mackey as store manager.  Affidavit of Jerry Young (herein, "Young Aff.") (Doc. No. 36-3), at ¶ 2.  As shift leader, McKinney was not authorized to hire or fire people, and she was not authorized independently to discipline other employees.  McKinney Dep., at 35:17 — 36:17.  She was authorized to confer with store manager, Jerry Young, about issuing discipline to other employees.  *Id.*

Approximately five employees worked at the Century Plaza store at any one time.  *Id.*, at 85:12-15.  McKinney frequently worked with crew persons Cedric Morris and Darrius Jackson.  According to McKinney, Morris, and to a much lesser extent, Jackson, often

---

[2] This portion of McKinney's deposition transcript indicates that Mackey promoted McKinney to shift leader in 2004, but this appears to represent an inadvertent misstatement made by McKinney.  McKinney does not deny R&L's assertion that she was promoted to shift leader in 2001.  *See* Def.'s Summ. J. Br. (Doc. No. 35), at 3, ¶ 5b.

engaged in obscene, insulting, and/or offensive behavior at the workplace.   The following is an exhaustive list of all such behavior in which McKinney says Morris and Jackson engaged:

1.   **Once in 1999**, before her rehire, McKinney saw Morris in the freezer with his pants unzipped with Misty Woods, a woman whom McKinney thinks Morris dated.  McKinney Dep., at 205:22 — 207:9; 208:16 — 209:22; 210:4 — 211:2. McKinney did not report this incident to anyone at R&L. *Id.*, at 209:23 — 210:6.

2.   **Once in 1999**, also before her rehire, Morris told McKinney that he "went down on" Woods and "that he'll do it again." *Id.*, at 281:7 — 283:1.   McKinney did not report this incident.  *Id.*, at 281:20-22.

3.   Morris touched his penis through his pants in front of McKinney "**several times a day**," **beginning in 2001**. *Id.*, at 183:6-20; 187:12-23.  McKinney reported this conduct to Mackey or to Young at least six times.  *Id.*, at 193:14-21; 197:15-22.   As a result of McKinney's reporting Morris's penis-grabbing, McKinney thinks that Mackey cut Morris's hours for one week in 2001.  *Id.*, at 196:3-6.

4.   **On two occasions**, Morris made remarks to customer Kimberly Harris in front of McKinney, such as that he "didn't like fat girls" and/or that Harris was "too fat"

for him to have sex with her.  Declaration of Kimberly
Harris (herein, "Harris Decl.") (Doc. No. 36-16), at ¶¶
4-5; McKinney Dep., at 295:11 — 305:20.  Harris did not
take offense at any of Morris's remarks because she "knew
[Morris's] personality," and because she had "concluded
[Morris] was a playful person who liked to tease."
Harris Decl., at ¶ 4.  McKinney says that Morris's
speaking to Harris this way "made [McKinney] upset."
McKinney Dep., at 295:17.  McKinney reported both of
these incidents to Young.  *Id.*, at 297:17-19; 305:21 —
306:2.  When she reported the incident to Young the first
time, Young was a shift leader or an assistant manager,
and Mackey was the store manager.  *Id.*, at 299:4 —
302:22.  When McKinney reported the second incident,
Young was the store manager.  *Id.*, at 305:21 — 306:5.

5. **Once in early 2005**, Morris stated in McKinney's presence
that he had attended a bachelor party featuring
strippers, and that he was "up on" the strippers.  *Id.*,
at 234:10 — 241:2.  McKinney did not report Morris's
comment because she believed that Young had overheard the
conversation.  *Id.*, at 243:15 — 244:19.  Young confirmed
that he did overhear Morris say that "he had gone to a
bachelor party that had strippers at the bachelor party."
Deposition of Jerry Young (herein, "Young Dep.") (Doc.

4

No. 36-19), at 85:5-10.

6.   **On several occasions**, Morris touched McKinney's head.
     *Id.*, at 211:10 — 218:13.   After one such occurrence,
     McKinney shoved Morris and told him to stop.  *Id.*, at
     215:2-6.   McKinney told Young to tell Morris to stop
     putting his hands on her head.  *Id.*, at 216:8 — 218:13.
     Young did stop, and McKinney does not recall another
     occasion on which Morris touched her head after that.
     *Id.*

7.   **In early 2005**, Morris grabbed McKinney's breasts.  *Id.*,
     at 218:14 — 227:5.   Morris kept his hands on McKinney's
     breasts for "a couple seconds," and then he laughed and
     walked off.  *Id.*, at 224:14 — 225:7.   McKinney reported
     this incident to Young.  *Id.*, at 225:11-12.   McKinney
     does not remember how Young responded.  *Id.*, at 225:16-
     18.

8.   **In early 2005**, Morris "pushed [McKinney] from the chili
     well to the second register."  *Id.*, at 227:6 — 233:20.
     McKinney was pregnant at the time.  *Id.*, at 228:18 —
     229:1.   McKinney immediately went to Young to tell him
     that Morris had pushed her.  *Id.*, at 231:8-10.

9.   **At least once**, Jackson "talked nasty, rude" to McKinney.
     *Id.*, at  344:15 — 347:22.   On one such occasion,
     approximately two months before McKinney's July 2005

termination, Jackson told McKinney that she needed "to leave [her] old man for him" and that he would take care of her. *Id.*, at 346:4-8. McKinney did not report any of Jackson's comments to any member of management. *Id.*, at 345:5-7. McKinney does not specifically recall how many times Jackson "talked nasty" to her. *Id.*, at 346:9-21.

10. Approximately **two months before her July 2005 discharge**, Morris said to "the employees in general" that he had "fucked" his girlfriend "from behind" and in "the chicken wing" position. *Id.*, at 286:11 — 288:2. McKinney did not report this incident to management "because Jerry [Young] was in on the conversation." *Id.*, at 288:23 — 289:15.

11. On **July 4, 2005**, McKinney saw Morris rub himself to erection by the freezer door and come to the store's front. *Id.*, at 310:3 — 324:15. Morris said, "I bet you won't believe I'll pull it out." *Id.*, at 317:3-22. Morris proceeded to undo his pants and to expose his penis to McKinney. *Id.* McKinney reported this incident to Young. *Id.*, at 324:16-20. When she did, Young laughed. *Id.*, at 326:22 — 327:2.

12. Morris made "nasty comments," which were "**every day**" occurrences. *Id.*, at 258:15-20. Among those that McKinney specifically recalls:

6

a.   In **early 2005**, Morris told McKinney, while he was standing at the ordering counter and while grabbing his penis, that "he was too big" for her.   *Id.*, at 250:4 — 255:11.   Fellow employee Gwendolyn Griffin was present during this incident. *Id.*, at 252:15-18.   McKinney did not report it to management. *Id.*, at 254:8-21.

b.   Morris once rubbed his chest while saying "you want some of this" to McKinney. *Id.*, at 255:4 — 264:4. McKinney did not report this incident to management. *Id.*, at 257:10-15.   Young was present when Morris said this to McKinney. *Id.*, at 261:7-10.

c.   Morris once told McKinney "you couldn't handle me." *Id.*, at 264:5 — 273:6.   McKinney did not report this incident to management. *Id.*, at 266:2-10.

According to R&L, there was posted at the Century Plaza Wendy's a poster notifying employees of a 1-800 telephone number that they should call if they believed they were being subjected to sexual harassment. Young Aff., at ¶ 2b. McKinney never called the 1-800 number to report any of the offensive conduct of Morris or Jackson, but she denies that a poster informing her of such a telephone number was ever posted. Pla.'s Resp. to Def.'s First Req. for Admis. to Pla. (Doc. No. 39-2), Resp. No. 1; McKinney

Dep., at 327:13-14.  It is undisputed that R&L had a written policy describing the actions employees should take in order to report sexual harassment in the workplace.  That policy provided:

### PROCEDURES FOR HANDLING HARASSMENT COMPLAINTS

A.   Any employee who believes that they [sic] have been the subjects of harassment should promptly report the alleged act to their immediate supervisor and/or Human Resources.  Employees who feel comfortable doing so should also inform the person engaging in such harassment that the conduct is offensive and must stop.

B.   Supervisory personnel who become aware of harassing conduct which is violation of this guideline must report such conduct immediately to Human Resources and initiate an investigation of the allegations. (Failure to do so may result in disciplinary action.)

C.   Human Resources has the responsibility of ensuring that all complaints of harassment are investigated and resolved in a timely and effective manner.  The employee who registered the complaint may be advised of the outcome.

D.   All investigations of harassment allegations will be conducted with all due regard to the need for confidentiality.  Employees have a responsibility to provide information needed to properly investigate the allegation(s).  All matters will be considered confidential with disclosure limited to only those directly affected.  Employee's [sic] who disclose confidential information to unauthorized parties will be subjected to disciplinary action.

E.   Where investigations confirm, appropriate disciplinary action will be taken up to and including discharge.  An employee whose allegations were made in good faith will not be subject to any retaliation on the part of [R&L].  However, should [R&L] determine the allegation(s) to be fabricated, the employee will be subject to disciplinary action up to and including discharge.

* * *

R&L Crew Employees Handbook (herein, "Employee Handbook"), Real
Aff., Attach. A, at 8-9; McKinney Dep., Ex. 6, at 8-9.  Although
Young never reported to Human Resources any of the allegedly
harassing conduct about which McKinney says she complained in
accordance with R&L's written policy, Young says that he is "aware
of no one who reported unwanted sexual touching, sexual comments or
words, sexually derogatory statements, or other kinds of conduct
during [his] employment at the Century Plaza Wendy's."  Young Aff.,
at ¶ 2c.

     In addition to the written harassment policy, R&L's Crew
Employees Handbook contained a written employee-conduct policy
which covered unexcused employee absences.  That policy provided:

**EMPLOYEE CONDUCT**

> It is [R&L's] desire that all of it's [sic] employees
> find the time they spend working to be a rewarding
> experience.  [R&L] intends to maintain a professional and
> pleasant work environment for its employees to enjoy.
>
> All employees are expected to conform to generally
> accepted business standards to behavior.  Employee
> discipline problems or performance problems may require
> corrective action by [R&L].  Depending on the seriousness
> of the problem the action taken could be any of the
> following:
>
> 1.  Written Warning
> 2.  Suspension of employment
> 3.  Termination of employment
>
> Disciplinary problems are generally broken down into one
> of two categories.  These are (1) Unacceptable Behavior
> or Conduct or (2) Flagrant Violations.

9

## UNACCEPTABLE BEHAVIOR OR CONDUCT

Although not exhaustive, the following are illustrative of those actions, which can usually be corrected through progressive discipline procedures. Employees will be given an opportunity to explain their view of the situation and given reasonable assistance in resolving any issues. Employees should be given specific length of time in which to correct the problem and understand that continued violation may lead to dismissal.

Frequent unauthorized tardiness or frequent unauthorized absence from work. The employee must notify the manager at least 30 minutes prior to the start of the shift if they are going to be tardy. The employee must notify the manager at least three hours prior to the start of their shift if they are going to be absent. Store openers must notify the manager at least ½ hour prior to the start of the shift or the evening before.

A note from the employee's physician may be required.

Negligence, resulting from inferior work, equipment breakdown, or intentional waste of products, materials or supplies.

Using telephones for excessive personal calls is not allowed. Cellular telephones, walkie-talkies and beepers are not permitted on line at any time. District Managers and other supervisory personnel may carry these items on line; however, they should use care to insure that their use does not our [sic] guests [sic] dining experience.

Violation of safety or health regulations.

Soliciting, collecting funds, engaging in propaganda or organizing activities, distributing pamphlets or other materials, posting notices or articles on [R&L] premises without proper approvals.

Any other non-crisis behavior which may be correctable and which does not threaten substantial [R&L] interests.

The following policy IS NOT subject to [R&L] progressive disciplinary action guidelines. Failure to report to work without the required notice, as outlined above, is grounds for immediate termination. A first infraction can result in immediate termination.

* * *

Employee Handbook, at 9-10.

McKinney missed a shift for which she was scheduled to work on July 11, 2005. McKinney Dep., at 120:6-8. She says that she missed her shift because she had to rush her uncle to the emergency room that day, and she "just didn't think about calling in." *Id.*, at 119:12-18. Approximately two hours after she was supposed to report for her shift, McKinney did call in to report her absence. *Id.*, at 121:7-19. She spoke to fellow shift-leader Gwendolyn Griffin. *Id.* Although she did not report her absence directly to Young or to any other member of management, "at that time, a manager wasn't scheduled until . . . later that afternoon." *Id.*, at 126:12-14. McKinney says she had medical documentation which proved that her uncle had to be taken to the emergency room, but that she did not show Young the documentation because Young "never asked for it." *Id.*, at 121:23 — 122:6.

On July 14, 2005, Young terminated McKinney. Young Aff., at ¶ 9. His only stated reason for the termination was that McKinney was a "no-call/no-show" on July 11, 2005. *Id.* McKinney had been warned on one prior occasion for having been absent for a shift without calling in. McKinney Dep., at 122:7-12. Young says that neither Griffin nor any other employee told him that McKinney had called Griffin to report her July 11, 2005 absence, but that it would not have mattered if he had been told because "the policy

required that [McKinney] speak with a manager." Young Aff., at ¶¶ 9c, 9d. McKinney says that she was "devastated" when she was fired, and that, as a result, she has been "stressed out" and has experienced hair loss. McKinney Dep., at 366:22 — 369:6.

On September 6, 2005, McKinney filed a charge of discrimination with the E.E.O.C. against R&L based on Morris's alleged sexual harassment of her. She received a right-to-sue letter on March 30, 2006, and she initiated this action on April 7, 2006.

*Summary Judgment Standard*

In considering a Rule 56 motion, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The court may enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts construed in favor of the non-movant.

*Analysis*

12

**I.  Hostile Work Environment Sexual Harassment**

To establish a *prima facie* case of hostile work environment sexual harassment under Title VII, McKinney must demonstrate a basis for holding the employer, R&L, liable for the harassment. *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000); *see Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). Employer liability in a case, like this one, involving sexual harassment by a co-worker, exists when the employer knew (had actual notice) or should have known (had constructive notice) of the harassment, and failed to take remedial action. *Breda*, 222 F.3d at 889; *see Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982). The other elements of a *prima facie* case of hostile work environment sexual harassment require that McKinney establish that (1) she is a member of a protected group; (2) she was the subject of unwelcome sexual harassment; (3) the harassment occurred because of her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. *Mendoza*, 195 F.3d at 1245. R&L concedes for purposes of its summary-judgment motion that McKinney is a member of a protected group (female), that she was subjected to unwelcome sexual harassment, and that the harassment occurred because she is a female. The only elements of the *prima facie* case that are in dispute are whether the harassment was sufficiently severe and

13

pervasive, and whether the harassment can be attributed to R&L.

This court has no doubt that a reasonable jury could find, based on McKinney's testimony, that the harassment to which she was subjected was sufficiently pervasive and hostile to support a Title VII claim.  In assessing whether harassment is objectively severe and pervasive, the court must look to (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247-48 (11th Cir. 2004) (citations omitted).  In considering these factors, the court must apply a totality-of-the-circumstances approach.  *Id.* at 1248; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).  R&L argues that McKinney can point to only 14 discreet acts of harassment (allegations 1-11 and 12(a), (b), and (c) above, *see supra* pp. 3-7), but many of the harassing acts to which McKinney says she was subjected happened more than once — with some occurring many times each day that McKinney and Morris worked together.  Although the court agrees that the totality-of-the-circumstances test is inherently difficult to apply in a completely objective manner, R&L completely abandons this principle in favor of a test that would evaluate each individual instance of alleged harassment in a vacuum.  Despite R&L's attempt to persuade the court otherwise,

there is sufficient evidence that McKinney was the target of constant, daily unwelcome sexual comments — such as Morris saying with sexual overtones that he was "too big for her," that "you want some of this," and that "you couldn't handle me" — to prove pervasiveness.  McKinney was also subjected to more than just the occasional unwelcome touching; Morris touched her head hair "on several occasions," and one time he grabbed her breasts with "enough pressure for them to go up."  Morris also once shoved McKinney across the store, which might not constitute an act of sexual harassment if it were viewed as an isolated event, but which could easily be interpreted by a reasonable jury as a sexually threatening act, given Morris's alleged pattern of behavior.  In addition to Morris's frequent comments directed exclusively at McKinney, and to his touching, shoving, or grabbing McKinney on numerous occasions, Morris's daily touching of his penis through his pants, and his one-time pulling his penis out of his pants in front of McKinney, could lead a reasonable jury to conclude that, under the totality of the circumstances, the harassment to which McKinney was subjected was severe and pervasive enough to alter the terms and conditions of her employment.

However, in order for her to succeed on her hostile-work-environment sexual-harassment claim, McKinney must also establish that the employer itself can be held responsible for the harassment.  McKinney can meet this requirement if R&L knew or

should have known of the harassing activity, but failed to take remedial action. *Breda*, 222 F.3d at 889. Although McKinney does not contend that R&L had actual knowledge of every episode in which she was harassed by Morris, the following is a list of incidents which McKinney says she reported to Young or to Mackey, or during which Young or Mackey was physically present and could hear or observe:

- Morris touched his penis through his pants in front of McKinney several times per day.

- Two times, Morris told customer Harris that he "didn't like fat girls" and/or that Harris was "too fat" for him to have sex with her.

- Morris said that he had attended a bachelor party where he was "up on" strippers.

- Morris touched McKinney's head hair.

- Morris grabbed McKinney's breasts.

- Morris pushed McKinney from the chili well to the second register.

- Morris told his fellow employees that he had "fucked" his girlfriend "from behind" and in "the chicken wing" position.

- Morris rubbed himself to erection, told McKinney that "I bet you won't believe I'll pull it out," and proceeded to expose his penis.

16

- Morris rubbed his chest while saying "you want some of this" to McKinney.

R&L's knowledge of the harassment is a question of fact, and a supervisor's knowledge can constitute the knowledge of the employer. *See Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1269 (M.D. Ala. 2001). (citing *Martin v. Norfolk Southern Railway Co.*, 926 F. Supp. 1044, 1051-52 (N.D. Ala. 1996)).  R&L contends that some of McKinney's complaints were too "generalized" to have put it on notice of Morris's objectionable behavior.  R&L may be correct in this regard, but that is an issue of fact that cannot be decided at the summary-judgment stage.  Based on the evidence presented by McKinney, a reasonable jury could find that managers Mackey and Young — and by extension, R&L — knew or should have known about Morris's allegedly harassing behavior.

The fact that McKinney never called the 1-800 telephone number which R&L says it posted to report any sexual harassment is not dispositive.  Although an employee must comply with the reporting procedures that her employer has established, *see Frederick v. Sprint/United Mgmt.*, 246 F.3d 1305, 1314 (11th Cir. 2001), R&L's written policy makes no mention of any 1-800 number.  It expressly states, however, that "[a]ny employee who believes that they have been the subjects of harassment **should promptly report the alleged act to their immediate supervisor** and/or Human Resources" (emphasis added).  There is evidence that McKinney followed this policy after

many of the incidents in which she says she was harassed by Morris. Moreover, R&L admits that action was taken against Morris only two times: once when Mackey cut his hours for one week in 2001, and again when Young told him not to put his hand on McKinney's head. Under the circumstances, a reasonable jury could find that these actions fail to amount to sufficient "remedial action" to exonerate R&L.  Accordingly, R&L's motion for summary judgment with respect to McKinney's hostile-work-environment sexual-harassment claim will be denied.

## II.  Retaliation

McKinney contends that R&L retaliated against her for engaging in activity protected by Title VII when it fired her on July 14, 2005.  In order to establish a *prima facie* case of retaliation under Title VII, McKinney must prove that (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action.  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  If she makes out a *prima facie* case, R&L must then articulate a legitimate, non-retaliatory reason for its actions, which McKinney must then demonstrate are pretextual if she is to prevail.  *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  R&L concedes the first two elements of the *prima facie* case for purposes of its summary-judgment motion, but

18

it says that McKinney's retaliation claim fails because she cannot meet the third element.  R&L further asserts that, in any event, there is no evidence that its stated legitimate, nondiscriminatory reason for firing McKinney is a pretext.

### A.  McKinney's Prima Facie Case

R&L contends that McKinney has not established her *prima facie* case because she cannot demonstrate that her being fired was causally related to her complaining about the allegedly discriminatory behavior of Morris.  In order to establish a jury issue of causal connection, McKinney need only show that her complaints about Morris, and her being fired, were not "wholly unrelated."  *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993).  The U.S. Supreme Court has noted that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period insufficient)).  McKinney last engaged in what might have been statutorily protected activity on July 4, 2005, when she reported

to Young that Morris had rubbed himself to erection and exposed his penis to her.  Young fired her on July 14, 2005.  The fact that only ten days elapsed between the time McKinney last complained about an act that arguably constituted sexual harassment in violation of Title VII, and the time she was terminated, can in itself establish the causal connection necessary to support her *prima facie* case.  In other words, this court finds that a ten-day period, unlike a 3- or 4-month period, can be reasonably considered "very close" for purposes of McKinney's Title VII retaliation claim.  Accordingly, there is a genuine issue of material fact regarding whether McKinney can establish her *prima facie* case of retaliation.

### B.  *R&L's Proffered Reason for Terminating McKinney's Employment*

R&L's Employee Handbook states:

The employee must notify the manager at least 30 minutes prior to the start of the shift if they are going to be tardy.  The employee must notify the manager at least three hours prior to the start of their shift if they are going to be absent.  Store openers must notify the manager at least ½ hour prior to the start of the shift or the evening before.

. . .

The following policy IS NOT subject to Company progressive disciplinary action guidelines.  Failure to report to work without the required notice, as outlined above, is grounds for immediate termination.  A first infraction can result in immediate termination.

R&L flatly and unequivocally says that it fired McKinney for one

20

reason, namely, because she was a "no-call, no-show" on July 11, 2005.  There is no dispute that McKinney did not call and report her absence to Young, and that she did not report her absence to anyone at the store until at least two hours after her shift was scheduled to begin.  R&L's termination of McKinney's employment is entirely consistent with its written policy.  R&L has thus met its light burden of articulating a legitimate, non-retaliatory reason for discharging McKinney.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

### *C.  Pretext*

Although R&L has met its burden of producing a legitimate reason for firing McKinney, McKinney "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext" for retaliation.  *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir.1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825 (1973)).  The court's task is to "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538.  A plaintiff can establish pretext by showing "that she has been the victim of intentional discrimination . . . either directly by persuading the court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chapman v. AI Transport*, 229 F.3d 1012, 1052 (11th Cir. 2000) (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095 (1981)). McKinney contends that R&L's stated reason for firing her is not credible because (1) R&L was unreasonable in not accepting her reason for not following the written attendance policy, (2) R&L has given conflicting explanations for its decision, and (3) R&L retained other employees who were similarly situated to her. *See* Pla.'s Br. in Resp. to Def.'s Mot. for Summ J. (Doc. No. 38), at 21-25.

1.   *McKinney explained why she did not report to work on July 11, 2005.*

McKinney first argues that R&L's having followed its written policy by firing her after she had an unexcused absence on July 11, 2005 is not a credible reason for her termination because she subsequently explained why she was absent. *See id.*, at 21-22. It may be true that R&L's policy allows employees to call in unexcused absences to a shift leader rather than to a manager, and to offer an explanation as to why they did not call in the absence in a timely manner. *See* Young Dep., at 32:20 — 33:1; Deposition of Gary Real (herein, "Real Dep.") (Doc. No. 36-18), at 76:16-18. It may also be true that R&L management believes that "there is a difference between someone not calling and not showing up and someone calling after they are supposed to be there to let

22

[management] know their situation." Young Dep., at 43:9-13. Even assuming that all of these things are true, there is no evidence to suggest that R&L **must** abandon, or even that it typically or occasionally does abandon, its written policy in favor of accepting a truant employee's excuse.

McKinney also contends that the specific reason for which she was absent — she says she was taking a relative to the emergency room — renders R&L's articulated reason for the termination unworthy of credence. R&L testified through its Rule 30(b)(6) representative that "if you're in the emergency room . . . that's about as good an excuse as you can come up with." Real Dep., at 77:2-4. Young also individually testified that a medical excuse "would be an excused absence if documentation was brought to my attention in that situation," and that a "medical excuse" would be accepted if the employee did call in the absence in accordance with company policy even if the employee could not provide documentation. Young Dep., at 28:14 — 30:1. In what appears to be an attempt to lead the court into a misinterpretation of the testimony, McKinney cites to this evidence despite the fact that counsel's questions that prompted the testimony were clearly intended to apply to an excuse related to an employee's **own** medical condition. Neither McKinney's counsel's questions, nor the witnesses' responses, can be reasonably understood to have referred to a third party's medical condition, as was the case with

McKinney's July 11, 2005 absence.  McKinney's ineffectual argument
on this part does not render R&L's articulated reason for firing
her unworthy of credence.

   2.   R&L offered "inconsistent reasons" in support of
        McKinney's termination.

   McKinney next contends that Young and R&L gave inconsistent
reasons for firing her, and that this establishes that R&L's reason
for firing her is unworthy of credence.  See Pla.'s Br. in Resp. to
Def.'s Mot. for Summ J., at 22-23.  McKinney cites to the following
evidence in support of this assertion:

- R&L's interrogatory answers, signed by Director of Human
  Resources, Gary Real, state that McKinney was "terminated
  by male general manager Jerry Young on July 14, 2005 for
  her failure to report for work or call in as required by
  company policy, *despite having been previously warned of
  such conduct.*" (McKinney's emphasis).  Def.'s Resp. to
  Pla.'s First Req. for Admis., Interrogs., and Req. for
  Produc. of Docs. (Doc No. 39-3).

- Real testified in his deposition that he personally is
  "not aware of any performance issues" with respect to
  McKinney.  Real Dep., at 80:23-24.

- Real's only personal knowledge of McKinney's absence is
  related to her last day of work.  *Id.,* at 81:5-6.

- Young testified that McKinney's "being tardy and being
  written up for a tardy has no warrant on her being fired

24

for this occurrence." Young Dep., at 44:17-19.

• Young also testified that "I can't remember any other
write-up for no call-no show other than this one that was
. . . for which she was terminated." *Id.*, at 39:23 —
40:2.

McKinney's argument is flawed in two respects. First, Real's own
statements are not internally inconsistent because R&L's
interrogatory responses were based on the knowledge of R&L, not on
that of Real individually (regardless of who signed the responses),
while the particular pieces of Real's testimony to which McKinney
cites were clearly based on Real's own personal knowledge, not on
that of R&L as a corporate entity.[3]

    Second, Young's deposition testimony and R&L's interrogatory
responses are not "inconsistent," and they in no way evince a shift
in R&L's reason for terminating McKinney. That Young did not
recall, on the day of his deposition, a specific previous instance
where he warned McKinney for being a no-call, no-show, is
consistent with R&L's statement that McKinney was terminated
"despite" being warned on at least one previous occasion by **someone**
at R&L, **particularly when McKinney herself admits that she had
received a prior warning**. Moreover, there is no inconsistency
whatsoever between R&L's interrogatory response and Young's having

---

    [3] Real testified both in his personal capacity and in his capacity as
corporate representative of R&L during his deposition. *See* Real Dep., at 8:5-
8.

stated that previous occurrences of McKinney's tardiness did not influence his decision to fire her.   No reasonable jury could conclude otherwise on this evidence.

   *3.   McKinney's comparators.*

   Finally, McKinney says that the reason R&L gave for firing her is unworthy of credence because R&L retained other employees who were similarly situated to her.  *See* Pla.'s Br. in Resp. to Def.'s Mot. for Summ J., at 23-25.  Specifically, McKinney points to R&L's actions with respect to employees Malcolm Russell and Tamika Stuttlemeyer.

   Russell was an employee who failed to call in to report an unauthorized absence, but who was not terminated.   Young Dep., at 65:1 — 67:4.   Russell was incarcerated when he was supposed to report for a shift, and Young excused his attendance-policy violation because "[t]here was no way for him to call" while he was in jail.   *Id.*, at 65:11.   Russell's situation is fundamentally different from that of McKinney.   Completely unlike Russell, the reason McKinney gave for not calling to report her absence was that she "just didn't think about calling in."   A reasonable jury could not find that Young's handling of the situation with Russell proves pretext regarding its articulated reason for firing McKinney.

   Stuttlemeyer was a "no-call, no-show" on two occasions.  *Id.*, at 67:10-11.   Young excused Stuttlemeyer's first violation because Stuttlemeyer had suffered from a stroke and had been hospitalized.

*Id.*, at 14-21.  Young does not recall the reason for Stuttlemeyer's second "no-call, no show," but he believes that she was fired because of this second occurrence.  *Id.*, at 68:11-20.  Similar to that of Russell, Stuttlemeyer's situation is quite different from McKinney's.  Stuttlemeyer was in the hospital after she had a stroke — a condition which rendered her at least temporarily and partially paralyzed — not because she was taking a family member who was ill to the emergency room.  *See id.*, at 67:17-19.  That Young excused Stuttlemeyer's absence, and not McKinney's, serves as no rebuttal to R&L's stated reason for discharging McKinney.

These conclusions are reinforced by what the Eleventh Circuit very recently held in *Crawford v. City of Fairburn*, 482 F.3d 1305 (11th Cir. 2007), which, like this one, involved an alleged retaliatory termination.  If *City of Fairburn* did not exist, this court might be persuaded to recognize an exception or avenue for pretext recognized by the Eighth Circuit in *Erickson v. Farmland Industries, Inc.*, 271 F.3d 718 (8th Cir. 2001).  In *Farmland Industries*, the Eighth Circuit held:

> We have said, "**[I]t is possible for strong evidence of a prima facie case to . . . present a factual issue on pretext.**"  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131 (1135 (8th Cir. 1999) (en banc).  *Accord Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 ("[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, **the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.**"'  (internal

citations omitted)).

*Id.* at 726 (emphasis added).

In the instant case, the termination followed so closely upon McKinney's last protected conduct that a strong suggestion of retaliatory motive is created, a motive that R&L might be motivated to cover up by seizing upon an innocuous rule violation. Some reasonable jurors might deduce from these circumstances that R&L's single articulated reason was contrived and therefore was pretextual. As the court reads it, *City of Fairburn* has taken away this possibility. In the instant case, R&L proffers one reason for terminating McKinney. Instead of putting all of its eggs in one basket like R&L did, the employer in *City of Fairburn* articulated five separate facially legitimate reasons for its decision to terminate. And yet, the Eleventh Circuit ruled:

> If the employer proffers more than one legitimate, nondiscriminatory reason, the **plaintiff must rebut each of the reasons to survive a motion for summary judgment.**

*Id.* at 1308 (emphasis added).

> [T]he December 2003 statements of the administrator do not raise questions about the truthfulness of any of the proffered reasons. **Viewed in the light most favorable to Crawford, they suggest a retaliatory animus, but they do not respond to the explanation of the City that Crawford's performance was unsatisfactory in four other areas of his responsibility.**

*Id*. at 1309 (emphasis added). In other words, it now appears that in the Eleventh Circuit an appearance of retaliatory animus is insufficient to rebut any other explanation proffered by the

employer for its termination decision following closely upon an employee's protected conduct. *City of Fairburn* invites employers to articulate multitudinous facially legitimate reasons for their adverse employment decisions, each and all of which must be proven pretextual by evidence beyond that in the *prima facie* case. The long-recognized defense approved by *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568 (1977), requiring an employer who concedes a discriminatory motive but also has a non-discriminatory motive to affirmatively prove by a preponderance of the evidence that it would have made the same decision without regard to the proscribed motive, seems to have lost its significance as a result of *City of Fairburn*.

In sum, the court finds, in light of *City of Fairburn*, that a reasonable jury could not be allowed to conclude that R&L's proffered reason for terminating McKinney's employment was a pretext for retaliation. Accordingly, R&L's summary-judgment motion will be granted with respect to McKinney's retaliation claim.

## III.  Invasion of Privacy

To succeed on her Alabama claim for invasion of privacy, McKinney must show (1) that the matters intruded into are of a private nature and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation. *Ex*

29

*parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998).

McKinney cites the following three acts of Morris, and contends that together they constitute the tort of invasion of privacy:

- Morris grabbed McKinney's breasts.

- Morris gave unsolicited announcements of sexual positions and women with whom he would or would not like to have sex.

- Morris removed his penis from his trousers.

Pla.'s Br. in Resp. to Def.'s Mot. for Summ J., at 26-27. The Alabama Supreme Court has recognized that "Restatement (Second) of Torts, § 652B, and its Comment, enunciate a clear and concise definition, and establish the perimeter, of the 'wrongful intrusion' tort, which, when read in light of [its] case law, affords meaningful guidelines" for the adjudication of the actions alleged by McKinney. *Phillips v. Smalley Maintenance Services, Inc.*, 435 So.2d 705, 708-09 (Ala. 1983). The Restatement, and its Comment, state:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.
>
> Comment:
>
> a. The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his

interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.

b. The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.  It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.  The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.

Under Alabama law, the actions of Morris may or may not constitute invasion of privacy.  Morris's conduct was offensive, objectionable, and reprehensible, but McKinney does not present any evidence that would create *respondeat superior* liability for R&L unless "invasion of privacy" is just another way of describing "assault and battery."  McKinney will be allowed to proceed under her assault and battery theory.  No reasonable jury could conclude that R&L, the only named defendant, vicariously committed the tort of invasion of privacy.  Accordingly, summary judgment in favor of R&L is appropriate with respect to this claim.

## IV.  Assault and Battery

R&L does not dispute that a question of fact exists as to whether Morris could be liable to McKinney for assault and battery

if he were a defendant.  Instead, it contends that its motion for summary judgment must be granted on this claim because it cannot be held liable for an intentional tort committed not by it, but by its employee.  An employer is vicariously liable for an employee's intentional torts if (1) the employee's acts are committed in the furtherance of the business of the employer, (2) the employee's acts are within the line and scope of his employment, or (3) the employer participated in, authorized, or ratified tortious acts. *Ex parte Atmore Comm. Hosp.*, 719 So.2d 1190, 1194-95 (Ala. 1998). The first two possibilities are inapplicable in this case.  R&L was in the business of selling hamburgers, and as a crew person, Morris's job was to facilitate that business.  No reasonable jury could find that Morris's harassing activity furthered, or was within the scope of this objective.

Whether R&L authorized or ratified Morris's activity is a question that merits closer attention.  R&L says that it could not have ratified Morris's conduct because it "could not have ratified conduct of which it was not aware. . . . A harassment policy was in place and everyone knew it."  To show ratification, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee, (2) that the tortious conduct visited upon the complaining employee, (3) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted ... a tort; and (4) that the employer

failed to take adequate steps to remedy the situation.  *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala. 1995).  As the court discussed in section I above, there is an issue of fact as to whether or not R&L was aware of the conduct of Morris which might have constituted assault and battery, and as to whether or not R&L nevertheless failed to take adequate remedial steps.  *See supra* pp. 16-17.  It is therefore the province of a jury to decide whether R&L ratified or encouraged Morris's tortious acts.  R&L's motion for summary judgment with respect to McKinney's claim for assault and battery will be denied.

## V. Negligent Supervision and Negligent Retention

In order to avoid a summary judgment on a negligent-supervision and negligent-retention claims, a plaintiff "must show or demonstrate that the employer had notice or knowledge (actual or presumed) of the employee's alleged incompetency for the employer to be held responsible; demonstrating liability on the employer's part requires affirmative proof that the employee's alleged incompetence was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371, 1373 (Ala. 1993). As the court has previously explained, there is a question of fact as to R&L's knowledge of Morris's conduct, precluding summary judgment.

R&L argues that even if it was negligent in supervising and

33

retaining Morris, it cannot be liable to McKinney under a theory of negligence because McKinney did not sustain a cognizable injury under Alabama law.  Specifically, citing *American Road Svc. Co. v. Inmon*, 394 So.2d 361 (Ala. 1980), R&L argues that Alabama cases since 1980 have consistently rejected invitations to recognize the tort of negligent infliction of emotional distress.  Declining to respond to this argument, McKinney says that she has suffered "mental anguish" as a result of R&L's alleged negligence in supervising and retaining Morris.  *See* Pla.'s Br. in Resp. to Def.'s Mot. for Summ J., at 29.  Under Alabama law, "mental anguish" is not a separate injury that can support a claim for negligence.  *See generally Inmon*.  Although she does not place a great deal of emphasis on the fact, McKinney does make a passing mention in her response to R&L's summary-judgment motion that she also experienced hair loss.  McKinney testified that she experienced this "physical injury," if it can be described as such, in response to being asked, "[h]ow did your being terminated affect you besides losing your paycheck?"  McKinney Dep., at 366:22 — 367:1.  McKinney therefore contends that her hair fell out after and because she was terminated, not during her employment because R&L negligently supervised or retained Morris.  The court will therefore grant R&L's motion for summary judgment on McKinney's negligent-supervision and negligent-retention claims.

**Conclusion**

For the foregoing reasons, R&L's motion for summary judgment will be granted with respect to McKinney's claims for retaliation, invasion of privacy, negligent supervision, and negligent retention.  With respect to McKinney's sexual-harassment hostile-work-environment claim under Title VII, and with respect to her claim against R&L for assault and battery, R&L's motion will be denied.

DONE this 31st day of May, 2007.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE